## J. W. FORRESTER v. THE STATE.

### No. 7030. Decided February 14, 1923.

**1.—Murder—Charge of Court—Exculpatory Facts.**
Where, upon trial of murder, the testimony of the principal State's witness reciting the conversation of defendant with her, showed some exculpatory facts for the defendant, an objection was made to the court's main charge because of the omission to embrace therein an instruction to the jury to the effect that the State having introduced said statement made by the defendant to the witness, the truth of any exculpatory or mitigating fact embraced therein will be presumed unless their falsity was shown by the evidence in the case, which objection the court overruled, the

same was reversible error. Following Pharr v. State, 7 Texas Crim. App., 487, and other cases.

**2.—Same—Sufficiency of the Evidence.**
    Where, upon trial of murder the evidence sustained the conviction, there was no reversible error on that ground.

**3.—Same—Evidence—Self-Defense—Requested Charge.**
    A request for an instruction eliminating from consideration of the jury against the defendant of the wounding of one of the deceased parties was correctly refused, besides the wounds upon one of the deceased as shown were relevant upon the issue of self-defense.

Appeal from the District Court of Fisher. Tried below before the Honorable W. R. Chapman.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*Stinson, Coombes & Brooks,* and *L. B. Allen,* for appellant.—Cited: Cases in opinion.

*R. G. Storey,* Assistant Attorney General, for the State.

MORROW, Presiding Judge.—Appellant is under conviction for the murder of B. F. Posey; punishment assessed at confinement in the penitentiary for a period of twenty-five years.

Posey and his wife were young people. They resided at Barstow, in Ward County, Texas. Forrester and Posey were old friends, and Forrester was unmarried and made the Posey house his home. They decided to move to Fisher County. Posey, with his household effects, went by railway to Rotan, while Forrester and Mrs. Posey went through the country in an automobile. They reached Rotan in advance of Posey and spent the night at a hotel, occupying the same room, though not the same bed. This occurred on Easter Sunday preceding the homicide in June. Posey had located on a section of land near Rotan and all resided there in the same house until the day of the homicide—June 17, 1921. There was a contract of sale of a half interest in the land from Posey to Forrester. In the contract there was incorporated a reservation to the effect that before appellant was permitted under the contract to sell his interest, Posey was to be accorded the opportunity to buy it, and Posey in turn obligated himself to buy it in the event appellant became dissatisfied and wanted to sell.

On the day of the homicide, Mrs. Posey and her husband were starting to the railroad station in order that she might visit her father. The appellant had spent the previous night at Rotan, leaving there early in the morning, and went to his home, arriving there soon after the deceased and his wife had started on their trip to the railroad station. The parties met near the gate of the Herrod home. They

stopped, apparently conversing for a time and returned to the house, and soon after, both Posey and his wife were killed.   Some conversations between the deceased and appellant were proved suggesting that they were about to dissolve their relations in accord with the contract mentioned.   The deceased and his wife, while on their way to the railroad station, passed the home of the witness Herrod and were met by the appellant at the gate, he riding horseback.

The homicide took place in the house.   Posey was shot in the breast one time.   His wife was killed by blows from some blunt instrument. The evidence points  to an iron bar found near the bodies with bloodstains on it as the weapon used in killing Mrs. Posey.   There was some blood sprinkled on the face of Posey.   A washpan with a bloody rag in it was found pushed under the kitchen cabinet.   There was blood upon the dress of Mrs. Posey and down as far as her lap. There were several wounds upon her, either of which, according to the medical men, would probably have rendered her unconscious.

After the homicide, appellant went to the home of the Herrod family, about a quarter of a mile distant, and had a conversation with Mrs. Herrod.   Out of Mrs. Herrod's testimony there arose one of the legal questions presented on this appeal.   Mrs. Herrod saw the parties meet at her gate, and apparently after having had the conversation, saw them go to their home.   She hollered at them as they passed and Mrs. Posey replied with a smile, though the witness did not understand what she said.   About an hour and a half later, the appellant came to the home of Mrs. Herrod and had a conversation with her.   She was interrogated about this conversation in her direct-examination by the State to the following extent:

".  .  .  he told me at that time that he killed him; he says, 'Frank tried to kill Maggie and I killed Frank.'   He didn't tell me how he killed him; he didn't tell me then that he shot him.   Before he told me he killed Mr. Posey, I pressed him to know what was the matter, he kept wanting to know where Mr. Herrod was, and I had to go out and show him the direction in which to go; I told him where Mr. Herrod was."

Mrs. Herrod went to the scene of the homicide and found Mr. Posey dead and Mrs. Posey still alive, and further testified on behalf of the State as follows:

"As quick as I could tell Mr. Forrester we had to have a doctor, he turned and started to his horse to go to 'phone for one; that left me and Mr. Herrod there.   I couldn't tell you how long we two was there together before any one came any more than as quick as Mr. Forrester could ride .to the 'phone and back.   I didn't see Mr. Forrester go all of the way.   I saw him go and when I saw him come back, he was riding as hard as he could ride.   Mr. Forrester got back about the time Mr. Gregory and the other men come, I don't know which one got there first but it was about the same time."

From the same witness on cross-examination, the appellant elicited the following testimony:

"I said that in about an hour and a half Mr. Forrester came back to my house. . . . He was on the horse; when he called me and I run to the door, his horse was reared up on his hind feet, standing almost perfectly straight on his hind feet. He seemed to me to be very much excited at that time. He asked me where Mr. Herrod was; he had not got off of the horse then. . . . He was so excited he couldn't open the gate and he came thru then and still couldn't think where Mr. Herrod was and I went around the house and pointed the maize out to him, showed him the maize and told him my husband was there. I asked him what was the matter. He was crying and I knew there was something the matter. . . . And I says, 'Mr. Forrester, tell me what is the matter,' and he says, 'Something bad happened at Frank's', and I says, 'Anything the matter with Maggie,' and he says, 'Yes, Frank tried to kill Maggie and I killed Frank,' and he got on his horse and went to the field; he went just as hard as the horse could run, right across the field. I asked him, I says, 'Is Maggie alive?' and he says, 'She was when I left.' He went away to the field, he went just as hard as he could ride to where I told him I saw my husband last. . . . I don't remember anything he said when he came back to the house with reference to how the killing occurred except he said he shot Frank; he told me Mrs. Posey called him, said: 'Lord a mercy, don't kill me. Oh, Mr. Forrester, run and help me,' and he said he went to the kitchen door and couldn't open that as readily as he wanted to and the north door in the west room was open and he went in that door, and when he got to where he could see, Frank hit Maggie one lick, and as he hit her, he said, 'Damn you, I'll kill you,' and then turned on him and says, 'Damn you, I'll kill you too, and then after that he said he run in and caught hold of Mr. Posey and Mr. Posey slung him off back in the northwest corner of the kitchen and he says, 'Then I shot him.' As to whether he said that Mr. Posey drew the iron bar on him, he said, 'He turned on me.' I believe he did say something about having an iron bar in his hand at that time; I believe he said, 'He turned on me with the iron bar.'"

The court instructed the jury on the law of murder, manslaughter and self-defense and in defense of another. These issues were submitted in a manner of which the appellant finds no fault, and we will add that the charge submitting these issues is open to no just criticism perceived by us .

The only serious attack upon the charge is that in which appellant complains of the omission to embrace in the charge an instruction to the jury to the effect that the State, having introduced the statement made by the appellant to the witness Mrs. Herrod, the truth of any exculpatory or mitigating facts embraced in the declaration so introduced, would be presumed unless their falsity was shown by the evi-

dence in the case. No special charge was asked but, by exception to the charge, the legal question as we have undertaken to state it above, is presented for review.

The rule for which appellant contends is stated in Pharr's case (7 Texas Crim. App., 487) in the following language:

"When the admissions or confessions of a party are introduced in evidence by the State, then the whole of the admissions or confessions are to be taken together, and the State is bound by them unless they are shown to be untrue by the evidence; such admissions or confessions are to be taken into consideration by the jury as evidence, in connection with all the other facts and circumstances of the case."

This rule has been emphasized and reaffirmed in many subsequent cases. See Pratt v. State, 50 Texas Crim. Rep., 227; Combs v. State, 52 Texas Crim. Rep., 616; Pratt v. State, 53 Texas Crim. Rep., 281; Banks v. State, 56 Texas Crim. Rep., 262. It is not applicable, however, in all cases. This has been often declared. Jones v. State, 29 Texas Crim. App., 21; Slade v. State, 29 Texas Crim. App., 392; Casey v. State, 54 Texas Crim. Rep., 587; Pickens v. State, 86 Texas Crim. Rep., 660. The question, therefore, is, Are the facts of this case such as to demand an instruction to the jury informing them of the existence of the rule stated and directing that it be given application in their deliberation?

In Pharr's case, supra, the State introduced a witness who, in his testimony, said:

". . . defendant admitted to me that he had killed the deceased, but said he had killed him in self-defense, though defendant had previously denied that he had done the killing. . . . He stated that he and deceased had traveled together from Kansas, and had been playing cards, and that he (defendant) had won the pony of deceased at cards; and that on the morning of the killing they were riding along, and got into a conversation about the pony defendant had won, when the deceased told the defendant that he had to give him back his horse. Defendant replied that he would not do it, when deceased said, 'Well, I will kill you then,' and immediately reached his hand into his saddlebags to get his pistol; and, believing that deceased was going to kill him, and that his life was in danger, defendant shot him."

Circumstances were introduced showing that the appellant and deceased were in company; that the deceased had a pistol and some other property, including a little money; that they were seen a short time before the homicide, apparently acting as though on friendly terms. A report of a pistol was heard, and a man was seen to run out of the bushes and pick up something. Afterwards the body of the deceased was found near this point. One of his pockets was turned inside out. He had been shot in the head. The court, in discussing the propriety of instructing the jury, used this language:

"It must be borne in mind that the whole defense of the defendant

rested on the fact that he had said he had killed the deceased, but did it in self-defense, coupled with that other portion of the same statement drawn out on the cross-examination of the witness who testified to it, and which, coming as it did, was legitimate testimony to go to the jury, to the effect that when the deceased said he would kill the defendant he was attempting to get his pistol, when the defendant raised his gun and fired. Now, all this may have appeared to the court to be a mere pretense and fabrication; but if so, the court should not have conveyed to the jury, by any word in the charge, or in any other manner, what his impressions really were as to any part of the testimony." (Pharr v. State, 7 Texas Crim. App., 478).

In Pratt's case, supra, the State introduced the declaration of the appellant that he had killed the deceased and in connection with it, he also stated that he did so in self-defense, and the State, at least in part relying upon this testimony to connect the appellant with the homicide, justice required an instruction as that under discussion in the instant case. So in Combs' case (52 Texas Crim. Rep., 616), the rule was applied in a well-considered opinion written by Judge Ramsey of this court, a case in which the State introduced the declaration of the appellant that he had killed the deceased, in connection with which he claimed that the fatal shot was fired by accident.

In the instant case, the State's counsel combats the view that there was error in declining to give the charge on the proposition that the declaration was not relied on by the State to connect appellant with the homicide, but that the State's reliance was upon circumstances. We think this position untenable. State's counsel might have refrained from introducing the exculpatory declaration, but having done so, the law operates upon it. Giles v. State, 67 S. W. Rep., 411. Aside from the declaration of the appellant which was introduced in evidence, that part of the corpus delicti which goes to show that the deceased Posey came to his death by violence, that is, by a pistol shot, is shown by the condition of his body and the wound upon it. To connect the appellant with it, the State introduced the testimony of Mrs. Herrod, and thus by the confession of the appellant, completed the proof of the corpus delicti by showing his connection with the homicide. The evidence which the State elicited from Mrs. Herrod was the declaration by the appellant in her presence that Posey "tried to kill Maggie," that is, his wife, and that he (appellant) killed Posey. The purpose and effect of this testimony was to identify the appellant as the slayer of Posey. The State having introduced it, and in connection with it, the statement that the deceased was about to kill his wife, it cannot ignore this latter exculpatory or mitigating fact. It can be disposed of only by proof of its falsity. It is not to be understood that the State, to prove its falsity, would have to introduce direct and affirmative evidence. It would be enough that its falsity appear to the satisfaction of the jury, beyond a reasonable doubt, from any or all of the facts.

before the jury. The exculpatory inference drawn from the declaration, namely, that the appellant shot Posey to prevent his killing his wife, was submitted to the jury as a defensive matter. It arose alone from the declaration of the witness Mrs. Herrod. In passing upon its truth, the precedents to which we have adverted, we think, under the facts of the instant case, made it imperative that the court, upon proper exception to its charge, should so amend it so as to inform the jury that the exculpatory declaration of the appellant would be taken as true unless its truth was refuted by the facts in evidence.

The contention of the appellant that the evidence in the case is not sufficient to support the conviction for murder, we think is without merit.

A request was made for an instruction eliminating from the consideration of the jury against the appellant of the wounding and death of Mrs. Posey. It is clear that the consideration of her death and the wounds upon her were relevant upon the issue of self-defense presented by appellant's declaration.

Because of the error pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*